# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00348-CR

**Michael Cooper, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT
### NO. D-1-DC-09-301725, THE HONORABLE CHARLES F. BAIRD, JUDGE PRESIDING

## O P I N I O N

Michael Cooper and two co-defendants were indicted for multiple counts of aggravated robbery arising out of a single home invasion that involved the attack of several people inside the home. *See* Tex. Penal Code Ann. § 29.03 (West 2011). A jury convicted appellant of five counts of aggravated robbery. The jury assessed appellant's punishment at imprisonment for 60 years on two counts, 80 years on two counts, and 65 years on the final count. *See id.* § 12.32 (West 2011). The trial court sentenced appellant in accordance with the jury's verdicts, ordering all five sentences to run concurrently. Appellant raises three points of error on appeal. We affirm the judgments of the trial court.

## FACTUAL AND PROCEDURAL BACKGROUND

The jury heard evidence that during the early morning hours of July 16, 2009, around 3:30 a.m., appellant and two accomplices, Joseph Foley and Abasi Price, invaded a house with the

intention of robbing its occupants. Appellant, Foley, and Price were dressed in black, had their faces covered with bandanas, and brandished numerous weapons, including a baseball bat, a gun, and a knife. Upon entering the house, the men began assaulting the occupants.

One of the assailants put a gun to the head of one of the two female occupants, Telia Cuspard, and ordered her to "get naked" and surrender her money. When Cuspard moved to comply, the intruder hit her over the head with the gun, and she fell to the floor. As she lay face down on the floor, one of the intruders cut open her shirt with a knife. She remained on the floor during the attack where she saw, and heard, the intruders beating up the other occupants and searching for valuables. Eventually, she heard a gunshot. Another of the occupants, James Barker, resisted, tackling one of the intruders and struggling with him until another intruder struck him repeatedly with a baseball bat. Barker lost consciousness. He suffered a fractured pelvis, head injury, internal bleeding to his brain, and heavy bruising over his body. At the time of trial, Barker continued to suffer headaches and memory problems resulting from the brain injury.

Three other occupants, Michael Mullins, Alvin Duran, and Paul Linden, were also injured during the attack. Mullins was hit in the head with an unknown object and fell to the floor. Duran was hit in the head with a pistol. Linden, struck repeatedly with a bat, suffered two broken skull bones, a broken jaw, a torn ear, and was still experiencing paroxysmal positional vertigo at the time of trial. Another occupant, Andrew Chaney, fled out the back door and attempted to scale the back fence, but Price caught him and forced him to return to the house at gun- or knife-point.[1] After

---

[1] There was conflicting testimony as to whether the weapon was a knife or gun: Chaney testified that he believed it was a gun, but Price testified that it was a knife.

Price forced Chaney back into the house and ordered him to lie down, one of the intruders emptied Chaney's pockets and, as Chaney attempted to protect himself by covering his head with his hands, shot him in the hand. Chaney suffered nerve damage to his hand and, at the time of trial, had not recovered his full range of motion and still experienced pain in his hand during cold weather. Chaney's plastic surgeon testified that Chaney would never recover the normal use of his hand.

Another occupant, Brian Forisha, was sleeping in his bedroom at the back of the house when the attack began. He awoke to the sounds of screaming, fighting, and things breaking. Two of the intruders then came into his room. One held a gun on him while the other punched him repeatedly in the face as he lay in bed. One of the intruders took his cell phone. Another occupant, Donald Lineberry, who was at the back of the house when the intruders burst through the front door, managed to escape the house undetected. He ran to a nearby convenience store and called 911.

The first police officers to arrive at the house observed Price carrying a television out the front door. When Price saw the police, he dropped the television and ran. Officers eventually apprehended him on the roof of a neighboring home. Police saw a second suspect drop a camcorder, camera, and baseball bat while attempting to flee the scene. They recovered these items plus additional items strewn throughout the neighborhood. Police discovered a bandana and a black Nike Air Jordan shoe in the backyard of a nearby house. Further down the street, in an alleyway, police found another black Nike Air Jordan shoe. Nearby, in the same alley, police also discovered a black t-shirt and black gloves. Across the street, officers found a black beanie hat. Subsequent DNA testing indicated that Foley could not be eliminated as the major contributor of the DNA on the bandana. Foley's DNA was also found on the t-shirt. Neither appellant nor Foley could be

3

eliminated as the source of the DNA on the black gloves. One of the gloves tested positive for gunshot residue.

Michael Stoll, who lived several blocks from the crime scene, testified that he came out of his house when he heard police helicopters flying overhead and found a bundle of clothes on the edge of the bed of his pickup truck. When he picked up the bundle—a jacket and a pair of blue and black gloves—two cellular telephones fell out and he saw a gun sitting on his truck. Stoll turned all of these items over to the police. Subsequent DNA testing of the blue and black gloves revealed a DNA mixture of several individuals, from which appellant could not be excluded as a contributor. Subsequent ballistics testing revealed that the gun had fired a casing that was found at the crime scene.

During his post-arrest interrogation, Price identified appellant and Foley as his accomplices. After interviewing Price, police officers determined that a Cadillac registered to appellant's wife had been parked near the crime scene.[2] Appellant's wife and stepson confirmed that appellant had taken the car from San Antonio to Austin the night of the robbery. Appellant's wife testified that she had to drive with appellant and a friend from the family's home in San Antonio to retrieve the Cadillac from a residential neighborhood in Austin. She indicated that appellant refused to go with her all the way to get the car but instead waited at Home Depot while she retrieved the car with appellant's father. Appellant's stepson testified that he saw appellant load a baseball bag (a bag designed to hold baseball bats) into the trunk of the Cadillac the night before the robbery. He

---

[2] While canvassing the neighborhood immediately after the robbery, the police recorded the license plates of all the vehicles parked in the neighborhood of the crime scene.

also testified that appellant was wearing black clothing and black shoes when he left for Austin that night and identified the baseball bat recovered from the crime scene as belonging to appellant. Cell phone records offered at trial indicated that at 3:35 a.m. the morning of the attack, appellant's cell phone was within a few miles of the crime scene.

The State eventually arrested appellant and charged him with sixteen counts of aggravated robbery. Before trial, the State elected to proceed on only six of the counts. The State charged appellant and Foley using essentially identical indictments, and the two men proceeded to trial as co-defendants. During trial, the victims of the robbery, Stoll, and appellant's wife and stepson testified to the events described above. Price also testified for the State. Price testified that, on the night of the robbery, appellant came to the house Price shared with Foley in Austin and told them he wanted to "hit a lick," which meant he wanted to rob someone. The three agreed to commit a robbery and got into appellant's Cadillac to drive around Austin to find someone to rob. Eventually, the trio followed a car with two women leaving a gentlemen's club to the house where the instant robbery occurred. Soon after the women entered the house, another car pulled up and another group of people went inside the house. Then, according to Price, appellant got a baseball bat and some gloves out of the car and also gave a gun to Foley. The three men covered their faces, went into the house, and began hitting people with the bat. Price testified that he saw someone trying to leave out of the back, but he grabbed that person from the fence and brought him back inside. The robbers put everyone on the floor and Foley held the gun on them. The three then went through everyone's pockets and took things from the house. Price testified that when the three attempted to leave through the front door, they saw police officers in the front yard. He indicated that he was able

to run away and climb up onto a neighboring roof, where he was later apprehended. The State also presented expert testimony from Austin Police Department DNA analyst Elizabeth Morris on the DNA evidence and Texas Department of Public Safety forensic scientist Juan Rojas on the gunshot residue found on one of the black gloves near the crime scene.

At the close of the evidence, the State waived one of the six counts and proceeded on the remaining five: aggravated robbery causing bodily injury to Chaney; aggravated robbery involving threat to Chaney; aggravated robbery causing bodily injury to Barker; aggravated robbery involving threat to Barker; and aggravated robbery causing bodily injury to Linden. The jury returned guilty verdicts on all five counts as to both defendants and, for appellant, assessed punishment at 60 years on two counts, 80 years on two counts, and 65 years on the final count. The trial court ordered appellant to serve all five sentences concurrently.

After trial, the State informed appellant's attorney that its DNA expert, Morris, had previously been reprimanded for quality-control issues related to her laboratory work.[3] Appellant moved for a new trial on the ground that Morris's work history constituted material, favorable evidence that the State had failed to disclose in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) (establishing that due process requires prosecutors to disclose material, exculpatory evidence to defendants). After conducting a hearing, the trial court denied the motion, ruling that the State had not been legally obligated to turn over evidence of Morris's work history.

---

[3] The State informed appellant's attorney of this fact via a mass e-mail sent to members of the criminal defense bar. The e-mail's purpose was to inform the criminal defense bar that the Austin Police Department had received a complaint about Morris's work and subsequently conducted an investigation. The State's e-mail transmitted the report that resulted from the investigation along with several related documents.

## DISCUSSION

Appellant raises three points of error on appeal, two complaining of double-jeopardy violations and a third contesting the trial court's denial of his motion for new trial. For the reasons discussed below, we overrule his points of error and affirm the convictions and sentences.

### *Double Jeopardy*

In his first two points of error, appellant urges a double-jeopardy claim based on his convictions for both aggravated robbery causing bodily injury and aggravated robbery by threat in connection with the same victim. He claims that, as a matter of law, he could only commit one count of aggravated robbery against each victim.

The Double Jeopardy Clause of the United States Constitution provides that no person shall be subjected to twice having life or limb in jeopardy for the same offense. U.S. Const. amend. V. This clause protects against multiple punishments for "the same" offense. *Brown v. Ohio*, 432 U.S. 161, 165 (1977); *Ex parte Cavazos*, 203 S.W.3d 333, 336 (Tex. Crim. App. 2006). The key factor in determining whether two offenses are "the same" for double-jeopardy purposes is whether the legislature intended to allow the same conduct to be punished twice. *Bigon v. State*, 252 S.W.3d 360, 371 (Tex. Crim. App. 2008).

The indictment in this case alleged that appellant committed two counts of aggravated robbery of Chaney and two counts of aggravated robbery of Barker. *See* Tex. Penal Code Ann. § 29.03. For each victim, one count alleged bodily injury and one count alleged threat. *See id.* §§ 29.02(a)(1)-(2), 29.03(a)(2) (West 2011) (person commits aggravated robbery if, in course of committing theft, he uses or exhibits deadly weapon and (1) "intentionally, knowingly, or recklessly

7

causes bodily injury to another," or (2) "intentionally or knowingly threatens or places another in fear of imminent bodily injury or death").

In a "situation in which two offenses from the same statutory section are charged," double-jeopardy analysis turns on the "allowable unit of prosecution." *Bigon*, 252 S.W.3d at 371-72; *see also Cavazos*, 203 S.W.3d at 336 ("The legislature . . . determines whether offenses are the same for double-jeopardy purposes by defining the 'allowable unit of prosecution.'" (Internal citations omitted.)). The "allowable unit of prosecution" is "a distinguishable discrete act that is a separate violation of the statute." *Ex parte Hawkins*, 6 S.W.3d 554, 556 (Tex. Crim. App. 1999). The legislature has not explicitly identified the allowable unit of prosecution for robbery. However, the court of criminal appeals has stated that "the allowable unit of prosecution for robbery is each victim." *Id.* at 561. Although this statement superficially suggests that appellant could not be convicted of more than one robbery per victim, it is not dispositive of this issue.

It is important to bear in mind why the court of criminal appeals in *Hawkins* held that "the allowable unit of prosecution for robbery is each victim." It did so because (1) "robbery is a form of assault" and (2) "the allowable unit of prosecution for an assaultive offense is each victim." *Id.* at 560. Because robbery is a form of assault, the court held that the logic that governs "assaultive offenses" governs robbery as well. *See id.* ("Since robbery is a form of assault, the allowable unit of prosecution for robbery should be the same as that for an assault.").

But that analysis does not apply in the present case. Bodily injury assault is a result-oriented assaultive offense, whereas assault by threat, focusing on the act of making a threat, is a conduct-oriented offense, regardless of any result that threat might cause. *Landrian v. State*,

268 S.W.3d 532, 536 (Tex. Crim. App. 2008). The two are separate and distinct assaultive crimes. *Id.* Thus, in the assault context, bodily injury and threat are not different methods of committing an offense, but rather are entirely separate offenses. *See Gonzales v. State*, 191 S.W.3d 741, 747-48 (Tex. App.—Waco 2006, pet. ref'd) (aggravated assault by injury is "separate and distinct" offense from aggravated assault by threat); *Marinos v. State*, 186 S.W.3d 167, 175 (Tex. App.—Austin 2006, pet. ref'd) ("[A]ggravated bodily injury assault and aggravated assault by threat are different statutory offenses, not just two methods of committing the single offense of aggravated assault."). It follows that bodily injury robbery and robbery by threat are not different methods of committing a single robbery offense, but rather entirely different robbery offenses. *See Woodard v. State*, 294 S.W.3d 605, 608 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) ("[T]he robbery statute provides two separate, underlying robbery offenses—robbery causing bodily injury and robbery by threat.").

Treating robbery causing bodily injury and robbery by threat as separate offenses accords not only with the case law governing assault, but also with the rule that "[a]bsent an explicit [legislative] statement that 'the allowable unit of prosecution shall be such-and-such,' the best indicator of legislative intent regarding the unit of prosecution is the gravamen or focus of the offense." *See Harris v. State*, 359 S.W.3d 625, 630 (Tex. Crim. App. 2011). Robbery causing bodily injury and robbery by threat have different gravamens—as with assault, bodily injury robbery is a "result of conduct" offense, whereas robbery by threat is a "nature of conduct" offense. *Cf. Marinos*, 186 S.W.3d at 174 (comparing aggravated assault causing bodily injury, a result-oriented offense, with aggravated assault by threat, a conduct-oriented offense). Because aggravated robbery

9

causing bodily injury and aggravated robbery by threat are distinct offenses, the trial court did not violate the prohibition against double jeopardy by punishing appellant for both under these facts. *See Bigon*, 252 S.W.3d at 370.

Moreover, even if aggravated robbery causing bodily injury and aggravated robbery by threat were the same offense, a double-jeopardy violation would still not be present on the facts of this case. Because appellant did not raise the double-jeopardy issue below, reversal is warranted only if error is apparent from the face of the record. *See Gonzalez v. State*, 8 S.W.3d 640, 643 (Tex. Crim. App. 2000). A court may legally impose multiple punishments for the same offense if the defendant has committed multiple discrete criminal acts. *See Gonzales*, 191 S.W.3d at 748 ("The commission of 'multiple discrete assaults against the same victim' results in liability for separate prosecution and punishment for every instance of such criminal misconduct.") (quoting *Vernon v. State*, 841 S.W.2d 407, 410 (Tex. Crim. App. 1992)); *Vick v. State*, 991 S.W.2d 830, 833 (Tex. Crim. App. 1999) (each "separate and distinct act" constitutes "separate and distinct statutory offense," even if all acts "are violations of a single statute"); *Ex parte Goodbread*, 967 S.W.2d 859, 860 (Tex. Crim. App. 1998) ("For Double Jeopardy purposes, '[t]he same offense means *the identical criminal act*, not the same offense by name.'" (quoting *Luna v. State*, 493 S.W.2d 854, 855 (Tex. Crim. App. 1973) (emphasis added)).[4] Thus, unless the record facially shows that appellant did not commit separate acts to support each of his convictions, we must affirm.

---

[4] Indeed, the court of criminal appeals has recently suggested that separate crimes of aggravated assault could be based on separately inflicted instances of bodily injury without regard to their temporal relation. *Johnson v. State*, 364 S.W.3d 292, 298 (Tex. Crim. App. 2012).

10

Having reviewed the record carefully, we conclude that it fails to facially show that appellant did not commit separate acts that would support each of his convictions. It is important to note that because the trial court instructed the jury on the law of parties, appellant could be convicted legally for every offense that he or one of his accomplices committed. *See* Tex. Penal Code Ann. §§ 7.01, 7.02 (West 2011) (law of parties); *Miles v. State*, 259 S.W.3d 240, 251 (Tex. App.—Texarkana 2008, pet. ref'd) (no double-jeopardy violation where defendant was convicted of both deadly conduct and deadly-conduct-based felony murder because "[t]he particular course of conduct engaged in by [the defendant], or by a co-actor for whom [the defendant] was criminally responsible, involved multiple distinct offenses under the deadly conduct statute."). That being the case, there was evidence that both appellant and Foley brandished weapons upon entering the house; this evidence supported both of appellant's convictions for robbery by threat, as the primary actor or as a party. There was also evidence that appellant beat Barker unconscious with a bat; this evidence supported appellant's conviction for robbery causing bodily injury to Barker. Finally, there was evidence that appellant's accomplice, Foley, shot Chaney after Chaney fled and was brought back into the house by Price; this evidence supported appellant's conviction as a party for robbery causing bodily injury to Chaney. Collectively, the evidence shows that distinct criminal acts may have supported appellant's convictions for robbery by threat and robbery causing bodily injury as to each of the victims. *See Gonzales*, 191 S.W.3d at 748; *Vick*, 991 S.W.2d at 833; *Goodbread*, 967 S.W.2d at 860. This means that a double-jeopardy violation is not apparent from the face of this

11

record.  *See Gonzales*, 8 S.W.3d at 643.  We therefore overrule appellant's first and second points of error.[5]

### *Motion for New Trial*

In his third point of error, appellant challenges the trial court's denial of his motion for new trial.  He argues that the trial court erred by denying his motion for new trial because, under *Brady*, the State violated his due-process rights when it failed to disclose evidence concerning errors and contamination issues in the work that DNA analyst Morris performed in other cases.  *See Brady v. Maryland*, 373 U.S. 83 (1963).

We review a trial court's ruling on a motion for new trial using an abuse-of-discretion standard.  *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007).  We view the evidence in the light most favorable to the trial court's ruling and uphold the ruling if it was within the zone of reasonable disagreement.  *Id.*  "[A] trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record would support the trial court's ruling."  *Id.*

After appellant was convicted, the State informed his attorney that Morris had several documented incidents of contamination in her work on other cases and, as a result, had twice been subject to periods of heightened monitoring by her supervisor.  Most of these incidents (and both of the periods of heightened monitoring) occurred in the two years before Morris worked on appellant's

---

[5]  This same double-jeopardy claim was urged by appellant's co-defendant, Foley, in his appeal.  *See Foley v. State*, No. 03-10-00304-CR, 2012 WL 1499368, at *6-8 (Tex. App.—Austin Apr. 25, 2012, no pet. h.) (mem. op., not designated for publication).  Like appellant, Foley failed to raise his double-jeopardy claim to the trial court.  We concluded in *Foley*, as we do here, that a double-jeopardy violation was not clearly apparent from the face of the record.  *Id.*

12

case, but one incident occurred after Morris worked on appellant's case. It is undisputed that the State possessed evidence of Morris's work history before trial. The question presented to the trial court was whether, under *Brady* and its progeny, the State's failure to disclose that evidence entitled appellant to a new trial. We hold that the trial court did not abuse its discretion by answering that question in the negative.

Due process requires the prosecution to disclose exculpatory and impeachment evidence to the defense that is material to either guilt or punishment. *Ex parte Reed*, 271 S.W.3d 698, 726 (Tex. Crim. App. 2008); *see United States v. Bagley*, 473 U.S. 667, 676 (1985); *Brady*, 373 U.S. at 87. To succeed in showing a due-process violation under *Brady* and *Bagley*, a defendant must show that: (1) the evidence is favorable to the accused because it is exculpatory or impeaching; (2) the evidence was suppressed by the State, either inadvertently or willfully; and (3) the suppression of the evidence resulted in prejudice. *Pena v. State*, 353 S.W.3d 797, 809 (Tex. Crim. App. 2011) (quoting *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002)).

Favorable evidence is that which, if disclosed and used effectively, "may make the difference between conviction and acquittal." *Id.* at 811 (quoting *Bagley*, 473 U.S. at 676). However, nondisclosure of favorable evidence violates due process only if it is "material" to guilt or punishment. *Id.* at 812. The materiality requirement means a defendant must be prejudiced by the State's failure to disclose the favorable evidence. *Banks v. Dretke*, 540 U.S. 668, 691 (2004). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional

sense." *Pena*, 353 S.W.3d at 812 (quoting *U.S. v. Agurs*, 427 U.S. 97, 109-10 (1976)). The defendant must show that, "in light of all the evidence, it is reasonably probable that the outcome of the trial would have been different had the prosecutor made a timely disclosure." *Id.* (quoting *Hampton*, 86 S.W.3d at 612); *see Bagley*, 473 U.S. at 682. Materiality depends on the circumstances of the particular case and the evidence as a whole. *Webb*, 232 S.W.3d at 114. When evaluating whether the materiality standard is satisfied, the strength of the exculpatory or impeachment evidence is balanced against the evidence supporting conviction. *Pena*, 353 S.W.3d at 812; *Hampton*, 86 S.W.3d at 613.

Here, appellant failed to establish a reasonable probability that the outcome of his trial would have been different if the State had disclosed the evidence of Morris's work history. The head of the DNA lab where Morris worked, Cassie Carradine, testified at the hearing on appellant's motion for new trial that incidents of contamination are not uncommon in labs and do not compromise final test results. Carradine testified that when contamination occurs, DNA analysis is repeated to ensure sound results. Thus, even in the other cases where Morris's work did contain errors, those errors did not lead to unreliable final test results. Furthermore, Carradine testified that her lab uses multiple failsafe procedures to ensure the accuracy of every analysis and is regularly audited by outside monitors. She also testified that multiple analysts double-checked Morris's work in the present case and found it to be error-free, and there was no evidence from any source that Morris's work in this case might have contained errors or been contaminated. Indeed, Carradine evaluated Morris's work as "above average" at the time Morris worked on this case. Accordingly, the strength of the impeachment value of the evidence, if any, is somewhat weak. Further, the record

14

reflects that appellant's attorney had access to all of Morris's records in this case and a full opportunity to cross-examine Morris regarding her work in this case. Finally, while the State used Morris to establish that appellant could not be ruled out as a source of DNA found on the black gloves discovered near the crime scene or the blue and black gloves found with the gun, Morris's testimony was not the only evidence of appellant's guilt. The State offered incriminating cell phone records tracking appellant's phone from San Antonio to within a few miles of the crime scene in Austin and then back to San Antonio, testimony from appellant's accomplice (Price)—corroborated by the victims' testimony and physical evidence recovered from the crime scene, and testimony from appellant's wife and stepson concerning appellant's presence in Austin the night of the robbery, his car parked near the crime scene, his all-black attire, and his ownership of the baseball bat used during the attack. In light of all these facts, it was reasonable for the trial court to conclude that the undisclosed evidence of Morris's work history did not entitle appellant to a new trial. *See Hampton*, 86 S.W.3d at 612. Accordingly, we overrule appellant's third point of error.[6]

## CONCLUSION

Finding no reversible error, we affirm the judgments of the trial court.

---

[6] Appellant's co-defendant, Foley, also complained about the trial court's denial of his motion for new trial in his appeal. *See Foley*, 2012 WL 1499368, at *3-4. In *Foley*, we likewise concluded that the trial court did not abuse its discretion in denying the motion for new trial because Foley failed to establish a reasonable probability that the outcome of the trial would have been different had the State disclosed the evidence of the DNA analyst's work history. *Id.*

15

_____

                            J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Henson and Goodwin

Affirmed

Filed:   June 27, 2012

Publish