

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-0943-11

**MEGAN WINFREY, A.K.A. MEGAN WINFREY HAMMOND, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE NINTH COURT OF APPEALS
### SAN JACINTO COUNTY

**KELLER, P.J., filed a dissenting opinion.**

It appears to me that in finding the evidence insufficient to support appellant's convictions, the Court views the evidence in the wrong light and fails to give the jury the deference that it is due. I would hold that, viewed in the correct light, the evidence is sufficient to support appellant's convictions.

### A. General Principles

Under *Jackson v. Virginia*,[1] the standard for determining the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier

---

[1] 443 U.S. 307 (1979).

of fact could have found the essential elements of the crime beyond a reasonable doubt."[2]  A reviewing court must not engage in a divide-and-conquer approach to the evidence[3] but must consider the cumulative force of all the evidence,[4] including improperly admitted evidence.[5]  And "[w]hen the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination."[6]

### B. Evidence a Crime (Capital Murder) was Committed

It was undisputed that Murray Burr died and that his death was a homicide.  There was also evidence that a Bible (seen approximately four days before the murder) and two guns (purchased several months earlier) were missing from the residence.  This evidence was sufficient to support an inference that someone committed a capital murder.  The remaining question, then, is what evidence connects appellant to the crime.

### C. Evidence Connecting Appellant to the Crime

### 1. *Confession*

Jason King, appellant's ex-boyfriend, testified that after the murder occurred, when appellant had been drinking, she would sometimes make comments relating to Burr's murder.  When asked whether appellant would indicate why she would do anything to Burr or go over to his house, Jason

---

[2]  *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011) (quoting *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)).  *See also Jackson*, 443 U.S. at 319.

[3]  *Clayton*, 235 S.W.3d at 778.

[4]  *Sorrells*, 343 S.W.3d at 155 (quoting *Clayton*, 235 S.W.3d at 778).

[5]  *Neal v. State*, 256 S.W.3d 264, 277 (Tex. Crim. App. 2008).

[6]  *Sorrells*, 343 S.W.3d at 155 (quoting *Clayton*, 235 S.W.3d at 778).

said, "Her words were it was an easy lick." Jason interpreted the "easy lick" comment to mean that appellant thought they would get money. The Court says that appellant's "easy lick" statement "does not reveal any action on her part to actually kill Burr and take his money," but this views the statement from the wrong perspective, assuming that it refers to a possible motive—a reason she "might" do something. A rational jury could have inferred that appellant's statement "it was an easy lick" described instead an actual event in the past, and therefore was an admission to involvement in the capital murder. Given that appellant's statement is in the past tense, that is the more reasonable meaning.

The Court discounts this evidence in part because the police were unable to determine whether any money was taken during the murder. But the police's inability to determine whether money was taken does not mean that none was taken, nor does it mean that someone did not attempt to take money. For example, there was evidence that Burr's wallet was found on the washing machine, which could suggest that someone looked through it. Moreover, a rational jury could have concluded that items of value were taken, namely two guns and a Bible, and a rational jury might have concluded that the Bible was taken because of the possibility that money might be inside it.[7] Further, as will be discussed in more detail below, appellant made statements before the murder that indicated that she *thought* that Burr had money.

### 2. *Motive*

Although motive does not by itself establish that a crime has been committed, it can be significant evidence linking someone to a crime and indeed can be "the glue that holds the entire

---

[7] This possibility was discussed by a witness at trial.

case together."[8]

### a. "Easy Lick"

Even if the "easy lick" statement were not viewed as a confession, it would at least show motive to commit the crime. Moreover, the record contains two other incidents showing a motive to rob and kill Burr.

### b. Incident Observed by Robertson

About a month before the murder, a school district employee named Karen Robertson saw appellant jump up, run, and grab Burr by the arm and say, "Oh, Murray, Murray, when are you going to take me out and spend some of that money that you have? We know you have that money hid at home." Robertson testified that Burr was embarrassed, shook appellant loose, and went on about his business. In a footnote, the Court notes appellant's testimony that she knew that Burr did not have a lot of money because he was a janitor, but again the Court is viewing the evidence from the wrong perspective. The jury did not have to believe appellant's testimony.

### c. Incident Observed by Debra King

In a separate incident, schoolteacher Debra Jessup King saw appellant and Burr in conversation in the hall. As Debra approached, Burr turned away, and appellant clenched her fist and said, "Somebody should beat the shit out of him." Afterwards, appellant apologized for saying that statement out loud and said that she was just tired of all his cats. The jury did not have to believe this odd explanation for why she was angry at Burr, but regardless, this incident reveals a motive other than greed for murdering Burr: anger.

---

[8] *Hacker v. State*, No. PD-0438-12, 2013 Tex. Crim. App. LEXIS 157, at 22-23 (Tex. Crim. App. January 6, 2013).

### 3. *Consciousness of Guilt/Cover-up/Perjury*

Several incidents could have been viewed by a rational jury as showing appellant's consciousness of her own guilt and attempts to cover up the crime, both before and during trial.

### *a. Attempt to Establish Alibi*

Jason King testified that he and appellant went to Chris Hammond's house, and when they arrived she talked to Hammond about an alibi. The Court sees nothing significant about this incident because alibi is a legitimate statutory defense. A rational jury could have seen it that way, but a rational jury could also have inferred that appellant was trying to establish a false alibi to cover up her involvement in the murder.[9]

### *b. Shaving Pubic Hair*

The evidence also indicated that, after becoming aware of a warrant to obtain her pubic hair, appellant shaved herself. In the following colloquy, Jason King testified:

Q. [D]id Megan receive information that a search warrant was going to be conducted regarding pubic hair?

A. Yes, sir.

Q. Okay. Do you know what she did when she got that information?

A. Yes, sir.

Q. What did she do?

A. She shaved herself.

---

[9] *See Simmons v. State*, 282 S.W.3d 504, 510 (Tex. Crim. App. 2009) (about attempt to get someone to sign affidavit exonerating the defendant: "Although a rational juror could, as the court of appeals stated, find that this 'could be construed as the efforts of an innocent man, currently facing serious criminal charges, to clear his name,' this could also be construed by a rational juror as the efforts of a guilty man attempting to avoid responsibility for the offense by encouraging his accomplice to remain silent as to appellant's involvement in it.").

Katherine Wick, from the Sheriff's Department, testified that the first time she tried to obtain a pubic hair sample from appellant pursuant to a court order, appellant had shaved her pubic hair that morning. A rational jury could easily have believed that appellant shaved her pubic hair because she did not want to give the authorities evidence that might connect her to the crime.[10]

The court discounts the significance of this evidence because appellant gave "unchallenged testimony" that she regularly shaved her pubic hair, because she later provided a sample, and because her pubic hair did not match the hair recovered from the scene, but again the Court views the evidence from the wrong perspective. The jury did not have to believe appellant's self-serving statement that she always shaves her pubic hair,[11] especially in light of Jason's testimony indicating that the shaving occurred in response to the warrant. And when Wick could not obtain a sample the first time, she advised appellant that "if she shaved she would be in violation of the court order," so a rational jury could have believed that appellant gave a sample only because she realized that she would suffer consequences for refusing a second time and would ultimately be forced to provide a sample anyway. As for the fact that appellant's hair did not match the hair at the scene, a rational jury could have concluded that appellant believed there was a risk that it would match.

*c. Attempt to Contact Hammond during Trial*

During cross-examination, the State questioned appellant about attempting to reach Hammond:

---

[10] *See Bartlett v. State*, 270 S.W.3d 147, 153 (Tex. Crim. App. 2008) (refusing to submit to a breath test tends to show consciousness of guilt in a DWI prosecution).

[11] *See Wise v. State*, 364 S.W.3d 900, 906 (Tex. Crim. App. 2012) (jury did not have to believe defendant's brother's uncontroverted testimony that defendant purchased computer at a flea market in 2006).

Q. Would you explain to the jury why you called Chris Hammond's mother this morning wanting to talk to Chris?

A. I did not want to talk to Chris. I called and asked why he was subpoenaed, if he was going to testify.

Q. But you did that?

A. Yes.

Q. What did you think he was going to testify about?

A. I don't know. I guess another character witness.

Q. Are you afraid he had something incriminating to say about you?

A. Well, we are divorced.

The Court says it fails to discern any particular incrimination in these actions, but a rational jury could believe that she was attempting to contact her ex-husband to influence his testimony or because she was afraid of what he might testify to.[12] By concluding that the episode is not incriminating, the Court fails to view the evidence in the light most favorable to the verdict.

### d. Testimony

The Supreme Court has recognized that a defendant's trial testimony that denies wrongdoing can be considered as substantive evidence of guilt if a jury could rationally believe that the testimony was perjured.[13] This holding seems to apply even when the defendant's testimony merely denies

---

[12] *See Wilson v. State*, 7 S.W.3d 136, 141 (Tex. Crim. App. 1999) (an attempt to tamper with a witness is evidence of consciousness of guilt).

[13] *Wright v. West*, 505 U.S. 277, 296 (1992). *See also King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (false statements to the media indicated a consciousness of guilt and an attempt to cover up the crime).

wrongdoing,[14] but it applies especially when the defendant makes affirmative statements of fact in an attempt to distance herself from the crime.[15]

During her testimony, appellant denied any involvement in the crime, but she also made at least three affirmative statements in an attempt to convince the jury of her innocence. The jury could have disbelieved these statements. I have already discussed two of these: (1) that she did not think Burr had lots of money because he was a janitor, and (2) that she always shaved her pubic hair. The third statement was appellant's testimony that she did not know what an "easy lick" meant and discovered that it was a term used for illegal drug transactions:

> In fact, I had to ask somebody what an easy lick was. I believe it's drug-related, like selling drugs or picking up drugs or something to that nature. I didn't even know what that meant. I do not use that terminology.[16]

---

[14] *United States v. Zafiro*, 945 F.2d 881, 888 (7th Cir. 1991) ("The government cannot force a defendant to take the stand, of course, but if he does and denies the charges and the jury thinks he's a liar, this becomes evidence of guilt to add to the other evidence."), *aff'd on other grounds*, 506 U.S. 534 (1993); *West*, 505 U.S. at 296 (citing *Zafiro*).

[15] *Wilson v. United States*, 162 U.S. 613, 620-21 (1896) ("[I]f the jury were satisfied from the evidence that false statements in the case were made by defendant, or on his behalf, at his instigation, they had the right not only to take such statements into consideration in connection with all the other circumstances of the case in determining whether or not defendant's conduct had been satisfactorily explained by him upon the theory of his innocence, but also to regard false statements in explanation or defence made or procured to be made as in themselves tending to show guilt."); *West*, 505 U.S. at 296 (citing *Wilson*); *Ex parte Napper*, 322 S.W.3d 202, 250 (Tex. Crim. App. 2010) (Defendant showed his "own consciousness of guilt, as he advanced implausible explanations in an attempt to distance himself from evidence that tended to link him to the crime.").

[16] A LEXIS search reveals that the term "easy lick" appears in two unpublished cases as a reference to robbing someone. *Torrey v. State*, No. 2-08-042-CR, 2009 Tex. App. LEXIS 3951, at 4 n.4 (Tex. App.– Fort Worth June 4, 2009, no pet.) (not designated for publication); *Alcorn v. State*, No. 14-05-01195-CR , 2007 Tex. App. LEXIS 1407, at 8 (Tex. App.–Houston [14th Dist.] February 27, 2007, pet. ref'd) (not designated for publication). Several published cases refer to the similar phrase "hit a lick" as involving robbing or stealing. *Walter v. State*, 267 S.W.3d 883, 887 (Tex. Crim. App. 2008); *Amador v. State*, 376 S.W.3d 339, 341 (Tex. App.–Houston [14th Dist.] 2012, pet. ref'd); *Cooper v. State*, 373 S.W.3d 821, 826 (Tex. App.–Austin 2012, pet. granted); *Medina v.*

The jury could have believed that appellant was lying with respect to all three of these statements, and in turn taken these falsehoods as attempts to cover up her guilt.

### 4. *Scent Lineup*

Deputy Keith Pikett of the Fort Bend County Sheriff's Department conducted "scent lineups" using his trained bloodhounds. We have discussed this procedure in the case involving appellant's father.[17] In the present case, each suspect's scent was placed in a separate lineup along with control scents. Deputy Pikett and Ranger Grover Huff both testified that the dogs alerted on appellant's scent and also on the scents of her father and brother.[18] They also testified that Deputy Pikett did not know which of the scent samples belonged to appellant, and Deputy Pikett testified that the dogs were kept in separate compartments in his truck and did not watch each other conduct the lineup. On cross-examination, Ranger Huff testified that, due to wind conditions, it took a second pass by the first dog to alert on appellant's scent.

In Richard Winfrey, Sr.'s case, we held that "scent-discrimination lineups, when used alone or as primary evidence, are legally insufficient to support a conviction."[19] We explained that the dangers associated with using this type of evidence could be alleviated only by the presence of

---

*State*, 367 S.W.3d 470, 473 (Tex. App.–Texarkana 2012, no pet.). *See also Martinez v. State*, 272 S.W.3d 615, 632 n.10 (Tex. Crim. App. 2008) ("get a lick" phrase used to refer to a robbery-murder). At least one unpublished decision involves testimony that "hit a lick" is street slang for "go and rob someone" but could also refer to selling dope. *Burnside v. State*, No. 11-10-00371-CR, 2012 Tex. App. LEXIS 7399, at 10 (Tex. App.–Eastland 2012, no pet.) (not designated for publication).

[17] *See Winfrey v. State*, 323 S.W.3d 875 (Tex. Crim. App. 2010).

[18] Scent pads from Hammond and two other individuals who were suspects were also placed in lineups, but the dogs did not alert on them.

[19] *Id.* at 884.

corroborating evidence, so inculpatory results from a scent lineup could be used only in a supportive role.[20] In the present case, other evidence exists that connects appellant to the crime, so the scent-lineup evidence plays only a supportive role in supporting this conviction. In that regard, the scent lineup is some evidence, in combination with other evidence in the case, that connects appellant to the crime. But as discussed above, and as will be discussed further below, there is enough evidence to connect appellant to the crime without considering the scent evidence.

### 5. *Statements from Appellant's Father*

David Campbell, an inmate sharing a cell with appellant's father, informed the authorities of conversations he had with Richard Winfrey, Sr. Appellant's father told Campbell that one of his children enabled him to gain access to Burr's home, that the murder occurred afterwards, that Burr was stabbed repeatedly, and that two guns were taken. Until Campbell came forward with the information, the police had been unaware that guns were missing from Burr's home. The Court says "there was no evidence indicating when and under what circumstances the gun or guns were removed form Burr's home," but that is not correct. Campbell's testimony about what appellant's father said was some evidence that the guns were stolen during the murder.[21] Elsewhere, the Court acknowledges that Campbell's testimony is "somewhat incriminatory as to appellant's father" but claims that the testimony does not specifically inculpate appellant.

But appellant's father told Campbell that one of his two children helped him gain access to the home. From that testimony, the jury was entitled to believe that one of Richard Winfrey, Sr.'s

---

[20] *Id.*

[21] In any event, the jury could have inferred that the guns were stolen at the time of the murder because they had been bought within the past year, Burr was dead, and the guns were missing after the murder.

two children did indeed help him gain such access. Moreover, Sheriff Lacy Rogers said that between appellant and her brother, appellant was the dominant individual, the leader, while her brother was a follower. Also, appellant told Ranger Huff that she had an ability to control men in her life. The evidence at appellant's trial showed that it was appellant who expressed a motive to rob or hurt Burr on three different occasions, that she was the one seen having unusually familiar contact at school with the janitor, and that she was the one who initially resisted providing a hair sample. Nothing in the record points to similar conduct by her brother, except that the two of them would often go to Burr's house on their way to church and invite him to come along. Given all of this evidence, the jury could have rationally inferred that appellant was in fact the child that her father spoke of as helping him gain access to Burr's home.

### 6. *No Sign of Forced Entry*

Upon examining the windows and doors to Burr's home, Ranger Huff found no sign of forced entry. He also noticed that, except for the presence of the body, the massive bloodstains, and an overturned vacuum cleaner, the home was extremely neat and nothing was out of place. Nor was there any indication that things had been put back after a struggle. Ranger Huff concluded that the absence of evidence of a struggle suggested that Burr was killed in a sudden violent attack.

In combination, this evidence raises the likelihood that Burr was killed by someone he knew,[22] someone he would have opened the door for, who then took him by surprise and killed him quickly. Burr lived alone. He had some family who lived elsewhere, but law enforcement found no indication that he had a girlfriend. Appellant testified that she had been inside Burr's house four to

---

[22] *See Manns v. State*, 122 S.W.3d 171, 174 (Tex. Crim. App. 2003) ("There was no sign of forced entry - indicating that the murderer was likely someone the victim knew.")

six times and that she and her brother regularly asked Burr to come to church with them but that he always declined to do so. By her own testimony, appellant would have been someone that Burr would have opened the door for and allowed into his home.

### D. Evidence of Agreement for Conspiracy

The Court contends that there was no evidence of an agreement between appellant and one of the alleged co-conspirators. But the jury could have inferred the existence of an agreement between appellant and her father. As discussed above, the jury could have inferred that appellant was the individual who enabled her father to get access to Burr's home, that her father killed or helped kill Burr and steal guns and a Bible, and that appellant at least helped her father gain access with the intention of killing Burr and stealing from him. This information is sufficient for the jury to have inferred that appellant and her father had an agreement to rob and kill the victim.

### E. Conclusion

From the above discussion, I conclude that the evidence was sufficient to support appellant's convictions for both capital murder and conspiracy.[23] Because the Court holds to the contrary, I respectfully dissent.

Filed: February 27, 2013
Publish

---

[23] The Court does not address appellant's claim that the conspiracy conviction cannot stand because appellant's father and brother have been acquitted. Because this is a dissent, I will not address the claim in detail other than to remark that appellant's father was acquitted of capital murder (on appeal) but was never charged with, much less acquitted of, conspiracy.